**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Source Capital Funding Incorporated

Plaintiff,

v.

Barrett Financial Group, LLC, et al.,

Defendants.

No. CV-23-02113-PHX-DWL

**ORDER**

Beginning in October 2022, a digital marketing firm called Personal Public Relations, LLC, dba Search Control ("Search Control") sent notices to Google alleging that Source Capital Funding, Inc. ("Source Capital" or "Plaintiff"), a California-based hard money lender, was engaging in copyright infringement by displaying, on its website, certain text and images derived from other websites. Upon receipt of the notices, Google delisted and/or deindexed several of Source Capital's websites, allegedly causing Source Capital to sustain significant economic damages.

In this action, Source Capital alleges that Search Control submitted these notices on behalf of Barrett Financial Group, LLC ("Barrett"), an Arizona-based competitor of Source Capital, and that Barrett (as well as other certain defendants, including Michael Iucalano ("Iucalano")) thus violated § 512(f) of the Digital Millennium Copyright Act ("DMCA"). Source Capital also asserts related claims for tortious interference with prospective economic advantage, unfair competition, and declaratory relief.

Now pending before the Court is a motion to dismiss filed by Barrett and joined by

Iucalano. (Docs. 15, 25.) For the reasons that follow, the motion is granted as to Counts One, Two, and Three and Source Capital is granted leave to amend.[1]

## BACKGROUND

I. Factual Allegations

The following facts, presumed true, are derived from Source Capital's operative pleading, the First Amended Complaint ("FAC"). (Doc. 5.)

### A. The Current And Former Parties

Source Capital is a California private money lender. (*Id.* ¶¶ 5, 23.) It "is an A+ Accredited Business with the Better Business Bureau." (*Id.* ¶ 26.) Source Capital invests heavily in "advertising and search optimization" because "[t]he vast majority of [its] leads and resulting business are generated via this online advertising." (*Id.* ¶ 29.)

Barrett is an Arizona mortgage broker "and a direct competitor to Source Capital in the hard money lending space." (*Id.* ¶¶ 6, 24.)

Iucalano works as a licensed mortgage broker in Arizona. (*Id.* ¶ 7.)

Former Defendant Sidney Baum ("Baum") works as a mortgage broker and licensed realtor in California. (*Id.* ¶ 8.)[2]

The FAC alleges that Barrett, Iucalano, and Baum should be referred to collectively as "the Barrett Defendants." (*Id.* ¶ 9.) However, as discussed in more detail in later portions of this order, the FAC does not allege any facts suggesting that Iucalano and Baum are affiliated with Barrett in any way (let alone any facts suggesting they were involved in the sending of the challenged DMCA takedown notices).

Defendant Personal Public Relations, LLC is an Arizona marketing agency that does business under the trade name of "Search Control." (*Id.* ¶¶ 10-11, 25.)

Former Defendant Anthony Harding ("Harding") is an Arizona resident and the

[1] Count Four of the operative complaint is a claim for declaratory relief regarding the absence of copyright infringement. (Doc. 5 ¶¶ 59-63.) Although Barrett states in broad terms that "[e]ach of Source Capital's causes of action fails to state a claim and should be dismissed" (Doc. 15-1 at 1), nowhere does Barrett address Count Four. Therefore, the Court will not dismiss Count Four at this time.

[2] Baum was dismissed as a Defendant before this action was transferred to Arizona. (Doc. 46.)

principal of Personal Public Relations. (*Id.* ¶ 12.)[3] The FAC alleges that "'Search Control,' 'Personal Public Relations, LLC' and 'Anthony Harding' are alter-egos of the same individual or enterprise. References to Search Control . . . shall include each of them as though individually named, and/or as jointly and severally liable. . . . Search Control is an agent of Barrett and operates in relation to the allegations of this lawsuit as such. Barrett retains the right to control Search Control and direct its activities concerning the allegations of this lawsuit. Further, the Barrett Defendants and Search Control worked together to commit the wrongful acts alleged herein." (*Id.* ¶¶ 13-14.)

B. **The Challenged Conduct**

"On or about October 31 and November 3, 2022, Defendants filed false DMCA notices with Google relating to Source Capital's use of a banner containing text and certain images on Source Capital's website, hardmoneyfirst.com." (*Id.* ¶ 30.) "Defendants claimed in the DMCA notices that Source Capital's banner and text infringed on copyrighted material from Barrett's websites . . . hardmoneylenderscalifornia.com [and] hardmoneylendersarizona.com." (*Id.* ¶ 31.) More specifically, the DMCA notices stated that "4 content boxes near top of [Source Capital's] page, beginning with Rates starting at 7.99%, up to 70% LTV are copied identically from our website" and that "the original copyrighted text can be found on our website's homepage." (*Id.* ¶ 32, cleaned up.)[4] In fact, Source Capital "originally created the banner at issue and has been using it since at least 2015 . . . well before Barrett and/or Search Control started using the banner." (*Id.* ¶ 33.) "As further evidence that . . . the banner was copied from Source Capital, the banner on Barrett's websites indicate[s] that Barrett is an accredited member of the Better Business

---

[3] Harding was dismissed as a Defendant before this action was transferred to Arizona. (Doc. 33.)

[4] Plaintiff filed, as attachments to the FAC, "copies of the respective public records of the DMCA notices." (Doc. 5 at 17-25.) Barrett relies on those attachments in support of its dismissal arguments (Doc. 15-1 at 2), and Source Capital does not object to such reliance in its response. (Doc. 34.) The Court agrees with Barrett that it may consider the attachments without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials [including] documents attached to the complaint . . . without converting the motion to dismiss into a motion for summary judgment.").

Bureau . . . , which Source Capital is, and Barrett is not." (*Id.*)

Source Capital alleges that "Defendants' assertions made in the DMCA notice" were "knowingly false" and were "specifically designed to harm and damage Barrett's competitor, Source Capital, during one of the busiest times of the year for Source Capital." (*Id.* ¶¶ 34, 36.) "Defendants specifically targeted selective pages on Source Capital's websites that have historically been the most visited and highly trafficked . . . in order to inflict maximum damage and illegally divert as much potential business from Source Capital as possible." (*Id.* ¶ 37.) "Moreover . . . , DMCA filings are public record and anyone doing their due diligence on Source Capital could easily make a decision from Defendants' false filing to not do business with Source based on this fact alone." (*Id.* ¶ 36.)

In response to the DMCA notices, "Google delisted and/or subsequently deindexed several of Source Capital's webpages, in addition to Google compromising Source Capital's ability to market and drive traffic to its other webpages." (*Id.* ¶ 35.) This caused Source Capital to "suffer[] irreparable harm to its reputation and further damage to its business." (*Id.*) "Source Capital experienced a drastic decline in website traffic and leads during its busiest times of year, which translates into lost revenue and actual damages caused by Defendants." (*Id.* ¶ 38.) Further, "it took Source Capital years and hundreds of thousands of dollars to get to the top of Google's rankings, and now it is forced to start all over again. It could possibly take years and another significant influx of capital for Source Capital to reestablish its ranking." (*Id.* ¶ 39.)

Separately, Source Capital also alleges that "Barrett Defendants have been engaging in false and deceptive advertising further aimed at stifling competition" by "misrepresent[ing] that Barrett is a member of the American Association of Private Lenders ('AAPL') and the Arizona Commercial Mortgage Lenders Association ('ACMLA')" and that Barrett "is an 'Accredited Business' with the [Better Business Bureau]." (*Id.* ¶ 41.)

…

…

II. Procedural History

On March 4, 2023, Barrett filed an anticipatory lawsuit in the District of Arizona against Source Capital, Search Control, and other defendants, seeking, among other relief, a declaration that it had not violated 17 U.S.C. § 512(f) when Search Control sent the DMCA notices. *Barrett Fin. Grp. LLC v. Source Cap. Funding, Inc.*, 2:23-cv-00387-PHX-DWL (D. Ariz. 2023).

On March 6, 2023, Source Capital initiated this action in the Southern District of California. (Doc. 1.)

On March 23, 2023, Source Capital filed the FAC. (Doc. 5.) In Count One, Source Capital asserts a claim under 17 U.S.C. § 512(f) against "all Defendants" (*i.e.*, against Barrett, Iucalano, the now-dismissed Baum, Search Control, and the now-dismissed Harding). (*Id.* ¶¶ 42-47.) In Count Two, Source Capital asserts a claim for tortious interference with prospective economic advantage against Barrett, Iucalano, and the now-dismissed Baum. (*Id.* ¶¶ 48-52.) In Count Three, Source Capital asserts a claim for unfair competition, in violation of California's Unfair Competition Law ("UCL"), against Barrett, Iucalano, and the now-dismissed Baum. (*Id.* ¶¶ 53-58.) In Count Four, Source Capital asserts a claim for declaratory relief—specifically, for a declaration "that its banner ad does not infringe on any alleged copyright of Defendant Barrett, or any other exclusive rights that Defendant might assert under state or federal law"—against Barrett alone. (*Id.* ¶¶ 59-63.)

On April 19, 2023, Barrett moved to dismiss the FAC and alternatively moved to transfer venue to this Court. (Doc. 15.)

On May 5, 2023, Iucalano joined Barrett's motion. (Doc. 24.)

On May 25, 2023, Harding and Search Control filed their own combined motion to dismiss the FAC, which sought dismissal only based on the first-to-file rule and, in Harding's case, for lack of personal jurisdiction. (Doc. 31.)

On June 13, 2023, the Southern District of California dismissed all claims against Harding without prejudice. (Doc. 33.)

On July 27, 2023, Source Capital filed response briefs opposing Barrett's motion to dismiss and/or transfer (Doc. 34) and Harding and Search Control's motion to dismiss (Doc. 35).

On August 9, 2023, Search Control filed a reply in support of its motion. (Doc 37).

On August 10, 2023, Barrett filed a reply in support of its motion and Iucalano filed a reply in support of joinder in Barrett's motion. (Docs. 38, 39.)

On August 23, 2023, the Southern District of California dismissed all claims against Baum without prejudice. (Doc. 46.)

On October 5, 2023, the Southern District of California transferred this action to the District of Arizona without resolving Barrett's motion to dismiss. (Doc. 47-1.) The Court also indicated that it was denying Search Control's motion to the extent that motion sought dismissal rather than transfer. (*Id.*)

On October 16, 2023, in part due to the transfer, this Court dismissed Barrett's anticipatory lawsuit. Doc. 52, 2:23-cv-00387-PHX-DWL.

**DISCUSSION**

I. <u>Legal Standard</u>

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix*,

*Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II. Count One—Misrepresentation Under 17 U.S.C. § 512(f)

A. **The Parties' Arguments**

Barrett argues that Count One is deficient because the FAC does not sufficiently allege that Barrett directed Search Control to submit the DMCA notices. (Doc. 15-1 at 4-7.) Barrett also argues that "the FAC fail[s] to allege facts sufficient to support an inference that Barrett 'materially misrepresented material or activity'" or acted in "subjective bad faith." (*Id.* at 7-9.)

Source Capital responds that it has pled sufficient facts because it has "alleged that Barrett and/or its agents submitted the false DMCA notices" and that the misrepresentations were knowing and material. (Doc. 34 at 6-10.) Source Capital asserts that the "agent's bad faith belief is imputed to [Barrett]" and that it has sufficiently pled materiality because it alleged that Google removed and deindexed Source Capital's most trafficked and visited webpages. (*Id.* at 9-10, internal quotation marks omitted.)

In reply, Barrett characterizes Search Control as a "rogue agent who betrays his principal's interest" and contends that a principal cannot be liable under those circumstances. (Doc. 39 at 1-2.)

B. **Analysis**

"[T]o state a claim for misrepresentation under § 512(f), the plaintiff must allege [1] that the defendant knowingly and materially misrepresented that copyright infringement has occurred, [2] that service providers relied on such misrepresentations, and [3] that the plaintiff has been injured as a result." *Cal. Beach Co., LLC v. Han Xian Du*, 2020 WL 6276987, *6 (N.D. Cal. 2020) (cleaned up).

Source Capital has alleged sufficient facts to satisfy the second and third elements here, by alleging that the takedown notices caused Google to delist and deindex several of its most important webpages, resulting in economic harm. As for the first element, Barrett does not appear to dispute that the DMCA notices contained a material misrepresentation as to the existence of copyright infringement. Indeed, in its since-dismissed anticipatory

lawsuit, Barrett acknowledged that it "does not claim, and has never claimed, that it owned the copyright to the images or content on the 'hardmoneylendersarizona.com' website that is now disputed by Source Capital." Doc. 24 ¶ 34, 2:23-cv-00387-PHX-DWL. Rather, as discussed in more detail below, Barrett only disputes (1) whether it acted with the requisite mindset; and (2) in a related vein, whether it may be held responsible for the transmission of the false DMCA notices where it was not the transmitting party. At any rate, the Court agrees with Source Capital that the FAC sufficiently alleges that the allegations of copyright infringement in the DMCA notices constituted material misrepresentations.

As for whether the misrepresentations were made "knowingly," the Court will begin by analyzing the conduct of Search Control before turning to the potential liability of the movants, Barrett and Iucalano. The Ninth Circuit has explained that "[i]n § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004). *See also Ouellette v. Viacom Int'l, Inc.*, 2012 WL 1435703, *3 (D. Mont. 2012), *aff'd*, 671 F. App'x 972 (9th Cir. 2016) ("The Ninth Circuit has interpreted § 512(f) as setting a high bar for plaintiffs. Whether a copyright owner issued its takedown notice in 'good faith' is analyzed under a subjective standard. Thus, defendants such as Viacom are liable only if they know that the subject material is not infringing on its copyright when they issue their takedown notices.") (citation omitted). Applying these standards, Source Capital has failed to allege facts that plausibly suggest that Search Control acted with the requisite mindset in relation to the DMCA takedown notices. To be sure, the facts alleged in the FAC suggest that Search Control acted negligently and unreasonably when it sent the notices to Google. Paragraphs 33-36 of the FAC explain that the challenged banner images could not possibly have been copied from

the websites hardmoneylenderscalifornia.com or hardmoneylendersarizona.com (which, again, is what Search Control alleged in the notices) because, *inter alia*, "Source Capital's investigation revealed that there is no instance of the banner on [those] websites as of 2018" and the banner images indicate that the advertiser is an accredited member of the Better Business Bureau (but Barrett is not such a member). But again, it is not enough under § 512(f) to show that the accusations were unfounded or even objectively unreasonable—actual, subjective knowledge of falsity is required. *Rossi*, 391 F.3d at 1005 ("A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistakes. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner."). *See also Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153-54 (9th Cir. 2016) ("In *Rossi*, we explicitly held that . . . [w]hen enacting the DMCA, Congress could have easily incorporated an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement. . . . [T]hese holdings [were not] dictum.") Although the Court acknowledges the difficulty of satisfying this high standard, the bottom line is that the FAC fails to plead facts plausibly suggesting that Search Control acted "knowingly" in relation to the falsity of the DMCA notices. *Cf. Digital Mktg. Advisors v. McCandless Grp., LLC*, 2022 WL 18216003, *3 (C.D. Cal. 2022) ("Nor has Plaintiff pled facts sufficient to establish the 'knowingly' component of the first element. . . . Plaintiff has pled only that 'Defendants have no rights, title, or interest to' the photographs, that Defendants 'did not engage in any analysis' prior to filing its takedown notices, and that Defendants 'fail[ed] to take into consideration that it does not own the copyright, have the entire rights to photographs or images, or that other parties have rights to publication or other license to exploit the photographs or images.' But these allegations add up to nothing more than the allegation that Defendants mistakenly asserted rights in the works. This is not the same as alleging facts showing that Defendants subjectively, actually knew that they misrepresented their rights or that Plaintiff's conduct was infringing.") (citations omitted).

With these conclusions in mind, the Court next turns to Barrett. The parties spill much ink debating whether Barrett and Search Control had an agency relationship in relation to the transmission of the DMCA notices (and whether Barrett may, as a result of that relationship, be held liable for any resulting § 512(f) violations committed by Search Control). On the one hand, the Court tends to agree with Source Capital that the factual allegations in the FAC, as supplemented by the actual DMCA notices enclosed as attachments to the FAC, are sufficient to plausibly suggest the existence of an agency relationship. The notices state they were submitted on behalf of "Hard Money Lenders California" and "Hard Money Lenders Arizona." (Doc. 5 at 18, 21.) The FAC, in turn alleges that both of those websites are "Barrett's websites." (*Id.* ¶¶ 20, 31.) Additionally, the FAC alleges that Barrett retained Source Capital around the time Source Capital sent the DMCA notices. (*Id.* ¶ 25.) Finally, the FAC alleges that Barrett had a financial incentive to harm Source Capital, given the parties' status as direct competitors. (*Id.* ¶ 24.) Taken together, these facts plausibly suggest that Search Control sent the DMCA notices at the direction of Barrett and/or out of a desire to assist Barrett. Although it's possible that Search Control sent the notices without Barrett's knowledge or direction or for some reason unrelated to a desire to assist Barrett, the inferences of direction and control that Source Capital asks the Court to draw are plausible. *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Nevertheless, because Source Capital has failed to plead facts suggesting that Search Control violated § 512(f), there is no basis for holding Barrett liable under an agency or vicarious liability theory.[5]

The dismissal analysis as to Iucalano is even more straightforward. The FAC is utterly devoid of any factual allegations regarding Iucalano's role (if any) in the conduct at issue in this case. It simply identifies Iucalano as an Arizona mortgage broker (Doc. 5 ¶ 7)

[5] This conclusion makes it unnecessary, at least for now, to resolve some of the parties' disputes over the contours of agency and vicarious liability in this context.

and then attempts, without explanation, to lump him in with Barrett as one of the "Barrett Defendants" (*id.* ¶ 9). This provides an additional reason why Count One fails to state a claim as to Iucalano. *See, e.g., Dickenson v. Haga*, 2019 WL 416720, *3 (C.D. Cal. 2019) ("Plaintiff merely sets forth allegations as to actions taken by 'Defendants' as a collective group. Absent specific allegations identifying what actions each defendant took against Plaintiff and how such actions violated Plaintiff's rights, the Complaint fails to provide Defendants with fair notice of Plaintiff's claims or the grounds upon which they rest. As such, Plaintiff's claims against each individual defendant are subject to dismissal.") (citations omitted).

III. Count Two—Tortious Interference With Prospective Economic Advantage

A. **The Parties' Arguments**

Barrett contends that Count Two fails to state a claim because "Source Capital has not alleged an injury arising from intentional interference with prospective economic advantage." (Doc. 15-1 at 9.) More specifically, Barrett argues that the FAC offers only "conclusory allegations regarding economic relationships between the plaintiff and existing clients that Source Capital simultaneously describes as potential users of its services. Source Capital does not allege that any relationship suffered any actual interference, only that acts by the defendants were designed to disrupt these potential users." (*Id.* at 10, cleaned up.) These allegations are too speculative, Barrett contends, because they are "entirely based on the possibility of future harm, not actual harm, and not even probable harm." (*Id.*) "Even if interference with potential customers is a legitimate basis for tortious interference with prospective economic advantage, the FAC alleges only conclusory statements and no facts in support of Source Capital's contention that it has lost or may lose potential customers." (*Id.* at 11.) Finally, Barrett argues that Count Two is preempted by the DMCA because § 512(f) "provides an express remedy for misuse of the DMCA's safe harbor provisions" and "there is an irreconcilable conflict between" that provision and the availability of more expansive state-law tort liability. (*Id.*)

Source Capital responds that it is only required at the pleading stage to identify "a

third-party group" such as "retailers, distributors and suppliers" that will be impacted by Barrett's conduct and need not "individually name each member of the group." (Doc. 34 at 10-11, cleaned up.) Source Capital further argues that Barrett's preemption challenge is unavailing because Count Two is not premised on the DMCA notices but on other "alleged anticompetitive practices by Barrett," including that Barrett "misrepresents itself as a member of the . . . AAPL . . . and the [ACMLA]" and "as being an 'Accredited Business' with the Better Business Bureau" and "creat[ed] similar website names to Source Capital's" in an effort "to confuse Source Capital's clients" and "cause Source Capital to lose business and goodwill with its customer base." (*Id.* at 10-12.)

In reply, Barrett reasserts that Source Capital has failed to sufficiently allege "the specific relationships tarnished, the mechanism of their disruption, and the palpable economic consequences borne thereof." (Doc. 39 at 2.) Barrett disagrees with Source Capital that "merely flagging a third-party group would be adequate" and denigrates Source Capital's "musings about 'future' clientele" as "sheer conjecture." (*Id.* at 2-3.)

B. **Analysis**

On the one hand, Barrett's preemption argument fails because Source Capital has clarified that its tortious interference claim is not premised on the transmission of the DMCA notices but on unrelated forms of misconduct (*i.e.*, alleged false advertising and other efforts to confuse Source Capital's customers). (Doc. 5 ¶¶ 48-52.)

On the other hand, in light of this clarification, the Court agrees with Barrett that the FAC fails to sufficiently allege how Barrett's challenged actions affected Source Capital's business relationships. Under California law, which the parties agree is applicable here, "[i]ntentional interference with prospective economic advantage has five elements: (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388

P.3d 800, 803 (Cal. 2017). To satisfy the fourth and fifth elements, Source Capital must allege facts plausibly supporting "an economic relationship between the plaintiff and some third party" and "the probability of future economic benefit to the plaintiff . . . that was disrupted as a result of the allegedly tortious action." *Soil Retention Prod., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021) (cleaned up).

Source Capital has cited some lower-court decisions that suggest it could meet this standard without "individually nam[ing] each member of the [third-party] group" or by alleging interference with a relatively general third-party group such as "retailers, distributors and suppliers." (Doc. 34 at 10-11, cleaned up.) But even assuming such an approach might be permissible, Source Capital's allegations are still too threadbare—they simply do not support an inference that Barrett's challenged acts, apart from the DMCA notices, interfered with Source Capital's economic relationships. (Doc. 5 ¶ 52 ["The Barrett Defendants have committed and continue to commit such intentional, willful and malicious acts with the design of disrupting Plaintiff's business relations and reaping future economic benefit that would flow to Plaintiff, and such acts will cause damage to Plaintiff, including but not limited to lost profits and goodwill, monetary damage and damage to reputation."].) As other courts have concluded under analogous circumstances, conclusory allegations of this sort are insufficient. *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1150-51 (9th Cir. 2008) ("Sybersound has failed to plead facts either showing or allowing the inference of actual disruption to its relationship with the Customers. . . . In its complaint, Sybersound merely states in a conclusory manner that it 'has been harmed because its ongoing business and economic relationships with Customers have been disrupted.' Sybersound does not allege, for example, that it lost a contract nor that a negotiation with a Customer failed."); *Song v. Drenberg*, 2019 WL 1998944, *7 (N.D. Cal. 2019) ("[T]he FAC fails to name a single entity or person with whom Plaintiffs might have had a prospective business relationship with which Drenberg tortuously interfered. Instead, the FAC merely makes sweeping generalizations lacking any detail about the loss of prospective business opportunities.").

Finally, Iucalano is entitled to the dismissal of Count Two not only for the same reasons as Barrett but also for the additional reason that, as discussed in Part II.B above, there are no factual allegations in the FAC regarding Iucalano's conduct.

IV. Count Three—UCL Claim

A. **The Parties' Arguments**

Barrett argues that the UCL claim in Count Three should be dismissed because "allegations that . . . alleged affiliation misrepresentations on defendants' websites have caused potential customers not to borrow hard money from Source Capital . . . are conclusory and speculative" and "nowhere does Source Capital allege actual monetary damages, the amount of those damages, or that the damages were proximately caused by the alleged violations." (Doc. 15-1 at 12-14.) Barrett also argues that the predicate violation of 12 C.F.R. § 1014.3(n) on which Count Three is based makes the claim preempted because federal law does not create a private right of action under § 1014.3(n) and providing an additional state-law cause of action would conflict with the federal regulatory scheme. (Doc. 15-1 at 14-17.) Finally, Barrett argues that because Count Three is predicated on the fraud prong of the UCL, Capital must satisfy (and has failed to satisfy) Rule 9(b)'s heightened pleading standard. (*Id.* at 17-18.)

Source Capital responds that its allegations regarding Barrett's "false advertising and attempts to create similar website names and website contents as Source Capital in an attempt to confuse Source Capital's customers" are sufficient to show that it "suffered injury and lost money . . . in the form of lost revenue and business . . . due to Barrett's misconduct." (Doc. 34 at 12-13.) Source Capital further argues that the UCL permits plaintiffs to bring claims "even when the conduct alleged to constitute unfair competition violates a statute that does not provide a private right of action" and that no language in § 1014.3(n) "expressly precludes private enforcement, or expressly provides immunity for the conduct alleged." (*Id.* at 13-14.) Finally, although Source Capital appears to dispute whether Count Three is predicated only on the fraudulent prong of the UCL, it argues it satisfied Rule 9(b). (*Id.* at 14-15.)

In reply, Barrett asserts that due to a "complete bar under 12 U.S.C. § 5514 and the absence of any carved-out exception allowing a private cause of action in Regulation N, the presumption exists that Congress did not intend to establish one." (Doc. 39 at 4.) Barrett further argues that Source Capital has failed to meet its burden of establishing "that Congress intended to create a private cause of action" and that Source Capital "may . . . not plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." (*Id.* at 4-5, cleaned up.) Finally, Barrett argues that "Source Capital has not alleged an injury arising from an alleged violation" because it focuses on the "mere specter of future wounds." (*Id.* at 5-6.)

B. **Analysis**

Because Barrett's preemption challenge implicates the Court's subject-matter jurisdiction, the Court begins there. *McCray v. Marriott Hotel Servs., Inc.*, 902 F.3d 1005, 1009 (9th Cir. 2018) ("Preemption is a matter of subject matter jurisdiction . . . ."); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) . . . .").

Barrett's preemption challenge fails, as does Barrett's related argument that Source Capital lacks a private right of action. The UCL prohibits unfair competition, which "includes anything that can properly be called a business practice and that at the same time is forbidden by law." *Luxpro Corp. v. Apple Inc.*, 2011 WL 1086027, *14 (N.D. Cal. 2011) (internal quotation marks omitted). The UCL "borrows violations of other laws . . . be [they] civil[,] criminal, federal, state or municipal, statutory, regulatory, or court-made . . . and treats them as unlawful practices." *Id.* at *14-15 (cleaned up). "It does not matter whether the underlying statute also provides for a private cause of action; [the UCL] can form the basis for a private cause of action even if the predicate statute does not." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000). Thus, Source Capital can premise its UCL claim on alleged violations of Regulation N even though Regulation N itself does not create a private right of action.

This approach does not raise preemption issues. There is a general presumption against preemption in areas that are historically regulated by the states. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). False advertising and consumer protection are such areas, so the presumption against preemption applies here. *See, e.g., Durnford v. MusclePharm Corp.*, 907 F.3d 595, 601 (9th Cir. 2018) ("[A] presumption against preemption applies to the extent the FDCA is used to displace state law in an area of traditional state police power. Consumer protection falls well within that category.") (citation omitted); *Cortina v. Goya Foods, Inc.*, 94 F.Supp.3d 1174, 1187 (S.D. Cal. 2015) ("Consumer protection laws such as the UCL, false advertising law, and CLRA, are within the states historic police powers and therefore are subject to the presumption against preemption.") (cleaned up). Thus, Barrett must show that Congress had a "clear and manifest" preemptive "purpose." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

There are "three ways federal law may preempt state law." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008). More specifically:

> First, Congress may preempt state law by so stating in express terms. Second, preemption may be inferred when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicit congressional intent to displace all state law. Third, preemption may be implied when state law actually conflicts with federal law.

*Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (cleaned up).

Barrett's argument appears to be that either field or conflict preemption applies. (Doc. 15-1 at 16-17.) Field preemption exists where regulation in an area is "so pervasive that Congress left no room for the States to supplement it" or where "a federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022-23 (9th Cir. 2013) (cleaned up). Section 1014.3(n) prohibits misrepresentations in commercial communications regarding mortgage credit products suggesting that a "provider is, or is affiliated with, any governmental entity or other organization" or "[t]he product is or relates

to a government benefit, or is endorsed, sponsored by, or affiliated with any government or other program, including but not limited to through the use of formats, symbols, or logos that resemble those of such entity, organization, or program." On its face, this regulation undermines any claim of field preemption, as it contemplates parallel regulatory efforts in the same space by other "governmental entit[ies]," "government benefit[s] . . . or "affiliat[ions]," which presumably includes state government entities. Further, 12 C.F.R. § 1014.6 allows violations of § 1014.3(n) to be addressed by state governments. Section 1014.6 accomplishes this by reference to what is now 12 U.S.C. § 5538(b)(4), which provides: "Nothing in this section shall prohibit the attorney general of a State, or other authorized State officer, from proceeding in State or Federal court on the basis of an alleged violation of any civil or criminal statute of that State." *Id.* This provision shows explicitly that Congress never intended "to preclude enforcement of state laws on the same subject." *Valle del Sol Inc.*, 732 F.3d at 1023.

To the extent Barrett has raised a claim of conflict preemption, this argument fails too. Conflict preemption arises where "compliance with both state and federal law is impossible" or the state law becomes "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020). Either way, "the conflict must be an actual conflict, not merely a hypothetical or potential conflict." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009). Here, it is not impossible to comply with both the UCL and § 1014.3(n). In fact, Source Capital's UCL claim is only triggered *because* Barrett allegedly violated § 1014.3. *Cf. Farm Raised Salmon Cases*, 175 P.3d 1170, 1177 (Cal. 2008) ("[A]s state and federal laws impose identical requirements regarding the disclosure of the use of artificial coloring, compliance with one necessarily ensures compliance with the other."). Meanwhile, courts find obstacle preemption only rarely, and it is especially unlikely in an area that is within a state's traditional police powers. *In re Volkswagen*, 959 F.3d at 1212-13. Congress' purpose in enabling the CFPB to promulgate Regulation N was to protect consumers, including "from

unfair, deceptive, or abusive acts and practices." 12 U.S.C. § 5511. It is difficult to see how enabling consumers to sue when they have been subjected to unfair or deceptive practices in violation of Regulation N could be viewed as an obstacle to this purpose.

Nevertheless, on the merits, the Court agrees with Barrett that Source Capital has failed to adequately plead the injury and causation elements of its UCL claim. To have statutory standing to bring a claim under the UCL, a plaintiff must "establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 884-85 (Cal. 2011) (emphasis in original); Cal. Bus & Prof. Code § 17204. *See also ConsumerDirect, Inc. v. Pentius, LLC*, 2022 WL 16949657, *7 (C.D. Cal. 2022) ("Private enforcement actions under the UCL may only be brought by those who have suffered direct economic injury. This standing requirement is narrower than Article III standing; whereas a federal plaintiff's injury in fact may be intangible and need not involve lost money or property . . . a UCL plaintiff's injury in fact must specifically involve lost money or property.") (cleaned up). "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset*, 246 P.3d at 885-86 (citations omitted).

In an attempt to satisfy this statutory requirement, Source Capital alleges that "[a]s a proximate result of the acts of the Barrett Defendants as alleged herein, Plaintiff has suffered and will continue to suffer economic injury." (Doc. 5 ¶ 56.) But this sort of conclusory, fact-free allegation need not be accepted as true. *See, e.g.*, *Day v. California Lutheran Univ.*, 2023 WL 4893650, *2 (9th Cir. 2023) ("Coach Day has not alleged any concrete economic injury arising from defendants' allegedly unfair practices. Her

allegation that she 'lost money' in the form of 'compensation' is conclusory, and without more, insufficient to establish standing to pursue her UCL claim."); *Seitzinger v. Select Portfolio Servicing, Inc.*, 2018 WL 2010993, *4 (N.D. Cal. 2018) ("Despite this requirement, nowhere in the complaint does Seitzinger allege that she spent any money or lost property value in non-conclusory terms. While Seitzinger alleges that she suffered damages in the amount of foreclosure fees and costs added to her loan in an amount to be proven at trial, such statements are conclusory and are not entitled to be assumed true.") (cleaned up). Additionally, to the extent Source Capital intended to incorporate by reference the harm-related allegations underlying its tortious interference claim in Count Two, those allegations are insufficient for the reasons discussed in Part III.B above.

Finally, Iucalano is entitled to the dismissal of Count Three not only for the same reasons as Barrett but also for the additional reason that, as discussed in Part II.B above, there are no factual allegations in the FAC regarding Iucalano's conduct.

V. Leave to Amend

Source Capital seeks leave to amend in the event of dismissal. (Doc. 34 at 2.) Iucalano asks the Court to dismiss Source Capital's claims without leave to amend. (Doc. 38 at 5.) Barrett appears to oppose the amendment request as well. (Doc. 15-1 at 18.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Applying these standards, Source Capital's request for leave to amend is granted. Given that Counts One through Three are being dismissed due to a failure to plead sufficient facts, it seems possible that a Second Amended Complaint could cure the deficiencies. At any rate, the policy of extreme liberality underlying Rule 15(a) counsels

in favor of giving Source Capital one more chance at amendment.

Accordingly,

**IT IS ORDERED** that Barrett's motion to dismiss (Doc. 15), joined by Iucalano (Doc. 24), is **granted in part and denied in part**. Counts One, Two, and Three are dismissed as to Barrett and Iucalano. As for Count Four, it remains pending against Barrett. Additionally, Count One remains pending against Search Control.

**IT IS FURTHER ORDERED** that Source Capital may file a Second Amended Complaint within 21 days of the issuance of this order. Any changes shall be limited to attempting to cure the deficiencies raised in this order, and Source Capital shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 14th day of November, 2023.

Dominic W. Lanza
United States District Judge