**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Source Capital Funding Incorporated<br><br>                    Plaintiff,<br><br>v.<br><br>Barrett Financial Group, LLC, et al.,<br><br>                    Defendants. | No. CV-23-02113-PHX-DWL<br><br>**ORDER** |

Beginning in October 2022, a digital marketing firm called Personal Public Relations, LLC, dba Search Control ("Search Control") sent notices to Google alleging that Source Capital Funding, Inc. ("Source Capital"), a California-based hard money lender, was engaging in copyright infringement by displaying, on its website, certain text and images derived from other websites.  Upon receipt of the notices, Google allegedly delisted and/or deindexed several of Source Capital's websites, allegedly causing Source Capital to sustain significant economic damages.

In this action, Source Capital alleges that Search Control submitted these notices on behalf of Barrett Financial Group, LLC ("Barrett"), an Arizona-based competitor of Source Capital, and one of Barrett's senior directors, Michael Iuculano ("Iuculano"), and that Barrett and Iuculano thus violated § 512(f) of the Digital Millennium Copyright Act ("DMCA").  Source Capital also asserts claims for tortious interference with prospective economic advantage, unfair competition, and declaratory relief.

Now pending before the Court is a motion to dismiss filed by Barrett and joined by

Iuculano.  (Docs. 67, 72.)  For the reasons that follow, the motion is granted in part and denied in part.

**BACKGROUND**

I.    Factual Allegations

 The following facts, presumed true, are derived from Source Capital's operative pleading, the Second Amended Complaint ("SAC").  (Doc. 63.)

A.    **The Parties**

Source Capital is a California private money lender.  (*Id.* ¶¶ 4, 18.)  It "is an A+ Accredited Business with the Better Business Bureau."  (*Id.* ¶ 21.)  Source Capital invests heavily in "advertising and search optimization" because "[t]he vast majority of [its] leads and resulting business are generated via this online advertising."  (*Id.* ¶ 24.)

Barrett is an Arizona mortgage broker "and a direct competitor to Source Capital in the hard money lending space."  (*Id.* ¶¶ 5, 19.)

Iuculano "is a Senior Director at Barrett and . . . has the authority to represent and bind Barrett as its agent.  Iuculano is also a Loan Originator and Loan Officer of Barrett," "maintains his Nationwide Multistate Licensing System ('NMLS') license with Barrett," and "operate[s] under the dba 'Hard Money Lenders Arizona' which uses the NMLS license of Barrett."  (*Id.* ¶ 6.)

Search Control is an Arizona marketing agency.  (*Id.* at 2; *id.* at 7 ¶ 20.)

The SAC alleges that "Search Control is an agent of Barrett and Iuculano and operates in relation to the allegations of this lawsuit as such.  Barrett and Iuculano retain the right to control Search Control and direct its activities concerning the allegations of this lawsuit.  Further, Barrett and Iuculano and Search Control worked together to commit the wrongful acts alleged herein."  (*Id.* ¶ 8.)

B.    **The Challenged Conduct**

"On or about October 31 and November 3, 2022, Search Control, on behalf of Iuculano and Barrett, filed false DMCA notices with Google relating to Source Capital's use of a banner containing text and certain images on Source Capital's website,

hardmoneyfirst.com." (*Id.* ¶ 25.)  "Search Control claimed in the DMCA notices that Source Capital's banner and text infringed on copyrighted material from Iuculano and Barrett's websites . . . hardmoneylenderscalifornia.com [and] hardmoneylendersarizona.com." (*Id.* ¶ 26.)  More specifically, the DMCA notices stated that "4 content boxes near top of [Source Capital's] page, beginning with Rates starting at 7.99%, up to 70% LTV are copied identically from our website" and that "the original copyrighted text can be found on our website's homepage." (*Id.* ¶ 27, cleaned up.)[1]  In fact, Source Capital "originally created the banner at issue and has been using it since at least 2015 . . . well before Barrett, Iuculano, and Search Control started using the banner." (*Id.* ¶ 28.)  "As further evidence that . . . the banner was copied from Source Capital, the banner on Barrett's websites indicate that Barrett is an accredited member of the Better Business Bureau . . . , which Source Capital is, and Barrett is not." (*Id.*)

Source Capital alleges that the "assertions made in the DMCA notice" were "knowingly false" and were "specifically designed to harm and damage Barrett's competitor, Source Capital, during one of the busiest times of the year for Source Capital." (*Id.* ¶¶ 29, 33.)  Defendants "specifically targeted selective pages on Source Capital's websites that have historically been the most visited and highly trafficked . . . in order to inflict maximum damage and illegally divert as much potential business from Source Capital as possible." (*Id.* ¶ 34.)  "Moreover . . . , DMCA filings are public record and anyone doing their due diligence on Source Capital could easily make a decision from Defendants' false filing to not do business with Source [Capital] based on this fact alone." (*Id.* ¶ 33.)

In response to the DMCA notices, "Google delisted and/or subsequently deindexed

---

[1]     Source Capital filed, as attachments to the SAC, "copies of the respective public records of the DMCA notices." (*Id.* at 8-9 ¶ 27, 22-29.)  Barrett relies on those attachments in support of its dismissal arguments (Doc. 67 at 3-4) and Source Capital does not object to such reliance (Doc. 77).  The Court may consider the attachments without converting the motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials [including] documents attached to the complaint . . . without converting the motion to dismiss into a motion for summary judgment.").

several of Source Capital's webpages from Google, in addition to Google compromising Source Capital's ability to market and drive traffic to its other webpages."  (*Id.* ¶ 46.)  This caused Source Capital to "suffer[] irreparable harm to its reputation and further damage to its business."  (*Id.*)  "Source Capital experienced a drastic decline in website traffic and leads during its busiest times of year, which translates into lost revenue and actual damages caused by Defendants."  (*Id.* ¶ 38.)  Further, "it took Source Capital years and hundreds of thousands of dollars to get to the top of Google's rankings, and now it is forced to start all over again.  It could possibly take years and another significant influx of capital for Source Capital to reestablish its ranking."  (*Id.* ¶ 39.)

Separately, Source Capital also alleges that Barrett and Iuculano "have been engaging in false and deceptive advertising further aimed at stifling competition" by "misrepresent[ing] that Barrett is a member of the American Association of Private Lenders ('AAPL') and the Arizona Commercial Mortgage Lenders Association ('ACMLA')" and that Barrett "is an 'Accredited Business' with the [Better Business Bureau]."  (*Id.* ¶ 41.)

II.   Procedural History

On March 6, 2023, Source Capital initiated this action in the Southern District of California.  (Doc. 1.)

On March 23, 2023, Source Capital filed the First Amended Complaint ("FAC").  (Doc. 5.)

On April 19, 2023, Barrett moved to dismiss the FAC and alternatively moved to transfer venue to this Court.  (Doc. 15.)

On May 5, 2023, Iuculano joined Barrett's motion.  (Doc. 24.)

On October 5, 2023, the Southern District of California transferred this action to the District of Arizona without resolving Barrett's motion to dismiss.  (Doc. 47-1.)

On November 14, 2023, the Court granted in part and denied in part Barrett's motion to dismiss.  (Doc. 56.)  The Court further stated that "Source Capital may file a Second Amended Complaint within 21 days of the issuance of this order.  Any changes shall be

limited to attempting to cure the deficiencies raised in this order." (*Id.* at 20.)

On December 15, 2023, Source Capital filed the SAC. (Doc. 63.) In Count One, Source Capital asserts a claim under 17 U.S.C. § 512(f) against "all Defendants." (*Id.* ¶¶ 42-47.) In Count Two, Source Capital asserts for claim of tortious interference with prospective economic advantage against Barrett and Iuculano. (*Id.* ¶¶ 48-53.) In Count Three, Source Capital asserts a claim for unfair competition in violation of California's Unfair Competition Law ("UCL") against Barrett and Iuculano. (*Id.* ¶¶ 54-60.) In Count Four, Source Capital seeks a declaration against Barrett alone "that its banner ad does not infringe on any alleged copyright of Defendant Barrett, or any other exclusive rights that Defendant might assert under state or federal law." (*Id.* ¶¶ 61-65.)

On December 28, 2023, Barrett filed its motion to dismiss the SAC (Doc. 67) and request for judicial notice in support of its motion (Doc. 68.)

On January 5, 2024, Iuculano joined Barrett's motion to dismiss. (Doc. 72.)

The motion to dismiss, Iuculano's joinder, and the request for judicial notice are now fully briefed and no party requested oral argument. (Docs. 76, 77, 79, 80, 81.)

**DISCUSSION**

I. <u>Legal Standard</u>

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due

to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.     Local Rule 7.2(e)(1)

        A.      **The Parties' Arguments**

        At the outset, Source Capital argues that Iuculano's joinder violates Local Rule 7.2(e)(1) because Barrett's motion and Iuculano's joinder together total "22 pages of argument."  (Doc. 79 at 1.)

        Iuculano responds that Source Capital "is not prejudiced."  (Doc. 81 at 1.)

        B.      **Analysis**

        Iuculano's characterization of his filing as a "joinder" is inaccurate, as his filing advances additional dismissal arguments beyond those advanced in Barrett's motion to dismiss.  *Mississippi Band of Choctaw Indians v. State of Miss.*, 1991 WL 255614, *4 (S.D. Miss. 1991) ("Defendant Mabus may not use the Notice of Joinder to add any new issues to the Motion to Dismiss that was filed by the State of Mississippi. . . .  [T]he assertion of new defenses in the Notice of Joinder is, in effect, an attempt to place a new motion to dismiss before the Court and, therefore, such attempts must comply with all local rules relating to motion practice before this Court.").  Nevertheless, the "joinder" is only five pages long, which is far shorter than the 17 pages Iuculano could have filed pursuant to LRCiv 7.2(e)(1) had he chosen to file his own motion to dismiss, and it would have been permissible for Iuculano to use that up-to-17-page motion to incorporate, by reference, any dismissal arguments advanced in Barrett's separate motion.  *See, e.g., Weinstein v. Cardis Enterprises Int'l N.V.*, 2017 WL 354191, *3 (E.D.N.Y. 2017) ("[C]ontrary to plaintiff's contention, Magistrate Judge Locke did not err in considering the defenses to the amended complaint raised by some of Cardis NV's co-defendants in their pending motions to dismiss in this case, which Cardis NV incorporated by reference in its cross motion . . . .  [N]othing more would have been gained by requiring Cardis NV merely to reiterate the identical arguments in its submissions on the cross motion to set aside the default, other than causing it to expend additional time and incur additional costs.").  Thus, the Court will consider

both Barrett's and Iuculano's briefs in deciding the motion to dismiss. *Cf. Miyayama v. Burke*, 2022 WL 1665211, *8 (D. Nev. 2022) ("Tanner filed a joinder to Burke and TLOSHB's motion to dismiss that copies Burke and TLOSHB's motion almost verbatim. However, because it purports to advance its own arguments and seeks slightly different relief—dismissing Plaintiff's claims against Tanner—the Court construes it as a motion to dismiss in the interest of moving the case forward.") (citation omitted).

III.   Count One—Misrepresentation Under 17 U.S.C. § 512(f)

   A.   **The Parties' Arguments**

Barrett argues that "the [SAC] fails to state a claim under § 512(f) of subjective bad faith by Barrett." (Doc. 67 at 2.) First, Barrett argues that it "has denied any claim of copyright ownership for the images or content on the 'hardmoneylenders.com' website, thereby negating any personal knowledge of the alleged copyright." (*Id.* at 3-4.) Next, Barrett argues that "Source Capital does not allege that Barrett had direct knowledge of the DMCA takedown notices, nor that Barrett actively participated in issuing them or instructed Mr. Iuculano or Search Control to do so." (*Id.* at 4.) According to Barrett, Source Capital is wrongly proceeding under an agency theory, *i.e.*, that "simply because Barrett employed Mr. Iuculano as a loan originator, who used Search Control for internet services, Barrett should be directly responsible for any false DMCA notices issued by Search Control, regardless of Barrett's actual awareness or participation." (*Id.* at 5.) Alternatively, Barrett argues that "Source Capital's claim fails because of the absence of harm resulting from the DMCA notices." (*Id.* at 8.)

Iuculano joins Barrett's dismissal arguments and further contends that dismissal of Count One is warranted because "[t]he false DMCA notices which serve as the heart of Plaintiff's entire SAC were not submitted by Iuculano." (Doc. 72 at 2.) Iuculano elaborates that the SAC contains no "allegations establishing an agency relationship between Search Control and Iuculano" or that "Search Control was required to follow any alleged direction from Iuculano." (*Id.* at 2-3.) Iuculano further argues that it "is a leap too far" to "attribute the alleged subjective bad faith of Search Control to [him]" and that Source Capital's

allegations that he "did not act as an individual, but instead 'on behalf of Barrett'" necessarily means that "there is no agency between Search Control and [him]" and that he "cannot be held liable for the alleged conduct of Search Control (or of [Barrett])." (*Id.*) Iuculano further argues that he has not received "fair notice" because "[t]he SAC is devoid of any factual allegations regarding [his] role, as an individual, in the conduct at issue in this case" and that "an employee of [Barrett] cannot be held personally liable" for Barrett's "liabilities." (*Id.* at 3-5.)

As for Barrett, Source Capital responds that "if the facts pled indicate that the defendant could not have formed a good faith belief that the images were infringing, then the subjective bad faith requirement is met" and that "it is undisputed that principles of agency apply to impute bad faith to principals for agent bad faith." (Doc. 77 at 7-8, cleaned up.) Further, Source Capital argues the SAC "properly pleads the existence of a material misrepresentation that caused harm" and any argument that it "does not sufficiently plead the required element of harm . . . has been waived." (*Id.* at 8-10.) Source Capital further argues it "properly pleads the 'subjective bad faith' required to establish a cause of action," both because "Source Capital does allege that Barrett directly participated in and instructed Search Control to submit the notices while harboring a subjective bad faith intent" and because "there still exists the undisputedly bad faith of Search Control." (*Id.* at 11-12, emphasis omitted.)

As for Iuculano, Source Capital responds that "[w]hether through principles of agency, or independent subjective bad faith in his participation and direction of the submission of the DMCA notices, the subjective bad faith requirement is pled." (Doc. 79 at 2.) Source Capital further contends that "Iuculano's argument regarding 'fair notice' lacks merit." (*Id.* at 5.) Finally, Source Capital clarifies that it "is not alleging that Iuculano is a member of Search Control, or even Search Control's agent. . . . Iuculano is alleged to be Search Control's *principal*," and "Iuculano acting as the Senior Director of Barrett, with the authority to bind Barrett, engaged Search Control thereby becoming its principal and being vicariously liable for the wrongful conduct committed in the scope of the agency (in

1   addition to active participation in the DMCA notices)." (*Id.* at 6-8.)

2          In reply, Barrett argues that "Source Capital's agency relationship allegations are

3   not plausible" because "the SAC never truly alleges that Iuculano instructed Search Control

4   within the bounds of his authority, just the general allegation that Iuculano had authority

5   to bind Barrett," and also because the SAC "attempt[s] to intertwine Mr. Iuculano with

6   Barrett to blur any distinction." (Doc. 80 at 4-5.) Barrett also argues that no material

7   misrepresentation has been pleaded because "Source Capital now concedes there was no

8   'ultimate' delisting of their websites." (*Id.* at 7.) Regarding bad faith, Barrett argues that

9   "Search Control issued the DMCA notices," so "Barrett's intent, good or bad" is irrelevant,

10  and Source Capital's attempt to impute bad faith from Search Control is predicated only

11  on *Enttech Media Grp. LLC v. Okularity, Inc.*, 2020 WL 6888722 (C.D. Cal. 2020)—a

12  case that Barrett views as "differ[ing] substantially from this case." (Doc. 80 at 7-9.)

13         Iuculano replies that regardless of whether he was acting "as Barrett's employee"

14  or acting "on behalf of Barrett," he cannot "be held individually liable." (Doc. 81 at 2.)

15  Iuculano also reiterates that Source Capital "continues to lump [him] with Barrett in its

16  SAC." (*Id.* at 4.) Iuculano also argues that Source Capital "merely alleges . . . improper

17  and unsupported conclusions" and "expects this Court to agree they are sufficiently pled

18  facts." (*Id.* at 5-6.)

19         B.    **Analysis**

20         "[T]o state a claim for misrepresentation under § 512(f), the plaintiff must allege [1]

21  that the defendant knowingly and materially misrepresented that copyright infringement

22  has occurred, [2] that service providers relied on such misrepresentations, and [3] that the

23  plaintiff has been injured as a result." *Cal. Beach Co. v. Han*, 2020 WL 6276987, *6 (N.D.

24  Cal. 2020), *report and recommendation adopted*, 2020 WL 6271225 (N.D. Cal. 2020)

25  (cleaned up).

26         Source Capital has alleged sufficient facts to satisfy the second and third elements

27  here, by alleging that the takedown notices caused Google to delist and deindex several of

28

its most important websites, resulting in economic harm.  (Doc. 63 ¶¶ 34, 46.)[2]  Barrett contends there was no economic harm because certain documents attached to its request for judicial notice suggest that Source Capital's websites were not actually delisted by Google.  (Doc. 67 at 8-9.)  This argument is unavailing.  The documents on which Barrett relies to support this argument are two "Google Transparency Reports."  (Docs. 68-5, 68-6.)  Although those documents do indeed seem to indicate that the websites in question were never delisted by Google, they are not—contrary to Barrett's argument—subject to consideration at this stage of the case pursuant to the incorporation-by-reference doctrine.  The only extrinsic documents the SAC incorporates by reference are the DMCA notices that were *sent* to Google.  (Doc. 63 ¶ 27.)  Barrett's apparent theory is that the SAC's reference to these documents means that any other documents touching on Google's *response* to the DMCA notices are also incorporated by reference in the SAC.  But that is not how incorporation by reference works.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-03 (9th Cir. 2018) ("Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the district court converts the defendant's motion to dismiss into a motion for summary judgment, the plaintiff receives no opportunity to respond to the defendant's new version of the facts. . . .  Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim.") (citations omitted); *Baird v. Samsung Elecs. Am., Inc.*, 522 F. Supp. 3d 679, 684 (N.D. Cal. 2021) (declining movant's request to consider "disclaimers found in entirely different documents that are cited nowhere in the complaint" pursuant to the incorporation-by-reference doctrine).

Barrett's invocation of the doctrine of judicial notice fares no better.  As Barrett acknowledges, "a court may take judicial notice of matters of public record, but cannot

---

[2]      Because Barrett's challenge to the third element fails on the merits, it is unnecessary to resolve Source Capital's contention that Barrett forfeited that challenge.

take judicial notice of disputed facts contained in such public records." (Doc. 68 at 2, quoting *Khoja*, 899 F.3d at 999.)  *See also Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (reversing dismissal order because district court improperly "took judicial notice of disputed facts") (emphasis omitted); *Hampton v. California*, 2023 WL 6443897, *1 (9th Cir. 2023) ("Defendants' knowledge and the Receiver's involvement are key factual disputes in this case, and it would be inappropriate for us to take judicial notice of such disputed facts.").  Therefore, the Court will not take judicial notice of any facts in the documents appended to Barrett's request for judicial notice to the extent those facts contradict the well-pleaded allegations in the SAC.[3]

As for the first element, Barrett does not appear to dispute that the DMCA notices contained a material misrepresentation as to the existence of copyright infringement. Indeed, Barrett "denie[s] any claim of copyright ownership for the images or content on the 'hardmoneylenders.com' website." (Doc. 67 at 3.)  Although Barrett also states that "[t]his should not be interpreted as an admission that the DMCA notices falsely represented infringement claims, only that Barrett lacks personal knowledge on the matter" (*id.* at 4), all that matters for present purposes is that Barrett does not dispute the sufficiency of the SAC's allegation of material falsity.

Instead, Barrett focuses on (1) whether it acted with the requisite mindset; and (2) in a related vein, whether it may be held responsible for the transmission of the false DMCA notices where it was not the transmitting party.  As for whether the misrepresentations were made with the requisite mindset, the Court will begin by analyzing the conduct of Search Control before turning to the potential liability of the movants, Barrett and Iuculano.  The Ninth Circuit has explained that "[i]n § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation.  A copyright owner cannot be liable simply because an unknowing

---

[3]     The Court thus finds it unnecessary to further address Barrett's request for judicial notice (Doc. 68), as the remaining documents are only offered to contradict the SAC's well-pleaded factual allegations.

mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004) (citations omitted). *See also Ouellette v. Viacom Int'l, Inc.*, 2012 WL 1435703, *3 (D. Mont. 2012), *aff'd*, 671 F. App'x 972 (9th Cir. 2016) ("The Ninth Circuit has interpreted § 512(f) as setting a high bar for plaintiffs. Whether a copyright owner issued its takedown notice in 'good faith' is analyzed under a subjective standard. Thus, defendants such as Viacom are liable only if they know that the subject material is not infringing on its copyright when they issue their takedown notices.") (citation omitted).

Applying these standards, the SAC has sufficiently pleaded facts to support a plausible inference that Search Control knew the DMCA notices were false when it sent them. The SAC now alleges that Search Control "maintained and built portions of" Barrett's websites and "obtained the banner and text from Source Capital's websites." (Doc. 63 ¶¶ 14-15.)[4] Therefore, it is plausible that Search Control knew, contrary to its representations in the DMCA notices, that Source Capital was not copying the banner and text from Barrett. (*Id.* ¶¶ 15, 27.)

The Court next turns to Barrett. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." *Jones v. Royal Admin. Servs.*, 887 F.3d 443, 448 (9th Cir. 2008) (internal quotation marks omitted). "The legal consequences of an agent's actions may be attributed to a principal under a wide range of common law agency theories," with "the bedrock theories of agency" consisting of "actual authority, apparent authority, ratification, and employment (respondeat superior)." *Id.* at 448-49 (cleaned up). Assessing whether liability may be imposed on a principal for the agent's conduct is a holistic endeavor, but "the extent of control exercised by the principal is the

---

[4]    The FAC lacked sufficient factual allegations as to Search Control's subjective knowledge. (Doc. 56 at 8-9.) The additional factual allegations that have been added to the SAC are sufficient to change the analysis here.

essential ingredient." *Id.* at 450 (cleaned up). The Court sees no reason why these principles would not apply in the context of § 512(f). *Enttech Media Grp.,* 2020 WL 6888722 at *5 ("Okularity's bad faith" in "generat[ing] DMCA notices" is "imputed to other Defendants through their agency relationship"). Barrett attempts to distinguish *Enttech* by arguing that the allegations in that case supported inferences of bad faith and agency more strongly than those here (Doc. 80 at 8-9), but the only question that matters for present purposes is whether the SAC's allegations are sufficient to make an agency relationship between Barrett and Search Control plausible—not whether the agency-related allegations are *as* plausible as they were in *Enttech*.

The factual allegations in the SAC, as supplemented by the actual DMCA notices enclosed as attachments to the SAC, are sufficient to plausibly suggest the existence of an agency relationship. As an initial matter, the SAC expressly alleges that "Iuculano and Barrett . . . direct[ed] Search Control to submit the DMCA notices" and "communicated" their "bad faith plan" to use those notices to harm Source Capital when providing that direction. (Doc. 63 ¶ 37.) Those allegations, alone, are arguably sufficient to establish that Search Control was acting as Barrett's agent when it sent the notices and that Barrett may be held liable for Search Control's conduct. Restatement (Third) Agency § 7.04 ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority . . . and . . . the agent's conduct is tortious . . . .").

Other portions of the SAC reinforce this conclusion. For example, the notices state they were submitted on behalf of "Hard Money Lenders California" and "Hard Money Lenders Arizona." (Doc. 63 at 22-29.) The SAC alleges that both of those websites are controlled by Barrett. (*Id.* ¶¶ 6, 14-15, 29, 36.) Additionally, the SAC alleges that Barrett retained Search Control for the purpose of elevating those websites' Google rankings around the time Search Control sent the notices. (*Id.* ¶¶ 6, 20, 25.) The SAC also alleges that Barrett had a financial incentive to harm Source Capital, given the parties' status as direct competitors. (*Id.* ¶ 19.) The SAC also alleges that the notices in fact benefitted

Barrett by allowing its websites to achieve the top rating on Google—a status that Iuculano (on behalf of Barrett) then touted in a TV advertisement.  (*Id.* ¶¶ 30, 34, 39.)  Finally, the SAC alleges that Barrett previously tested this strategy by filing a DMCA notice on behalf of one website it owned against another website it owned to assess delisting potential.  (*Id.* ¶ 36.)  Taken together, these facts plausibly suggest that Search Control sent the false DMCA notices at the express direction of Barrett.  *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Barrett seems to argue, based mostly on an alternative version of the facts, that it cannot be vicariously liable because (1) Iuculano, and not Barrett, worked with Search Control; (2) "Barrett never crowned [Iuculano] as an officer with authority to act on corporate matters"; (3) the notices were sent on behalf of a website that Iuculano, not Barrett, owned; and (4) Anthony Harding "declared under penalty of perjury . . . that neither he nor Search Control is an agent of Barrett" nor "had any business dealings with Barrett." (Doc. 67 at 5-8.)  However, for purposes of resolving a motion to dismiss, the Court must accept all of Source Capital's well-pleaded allegations as true and construe them in the light most favorable to Source Capital.  *Fitness Holdings*, 714 F.3d at 1144-45.  If, after construing a plaintiff's well-pleaded allegations as true, "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).  As explained above, the SAC pleads sufficient factual allegations to create a plausible inference of agency and actual authority, so Barrett's protestations that these allegations are inaccurate or incomplete are irrelevant at this stage.  The Court acknowledges that the SAC sometimes lumps together Iuculano and Barrett in a frustrating fashion that obscures who was responsible for specific acts—a practice the Court warned against when dismissing the previous iteration of the complaint (Doc. 56 at 10-11)—but the SAC also contains specific allegations that Iuculano was "a Senior Director at Barrett," has "describe[d] himself as such," and "acts as Barrett's

employee." (Doc. 63 ¶ 6.)  The SAC also alleges that the television appearance involved "Iuculano go[ing] on television, on behalf of Barrett and with Barrett's authorization by use of Barrett's license, to brag about their Google rankings." (*Id.* ¶ 44.)  Thus, it is plausible to construe the allegation that "Iuculano and Barrett . . . direct[ed] Search Control to submit the DMCA notices" (*id.* ¶ 37) as an allegation that Iuculano provided this direction on behalf of Barrett in his capacity as an employee of Barrett.  After all, Barrett as an inanimate entity could not have provided the direction itself—it needed to act through its own agents.

The flip side of these conclusions is that Count One of the SAC fails to state a plausible claim for relief against Iuculano.  Although the SAC adds a few details concerning Iuculano's job (Doc. 63 ¶ 6) and alleges that "Iuculano and Barrett" directed Search Control to transmit the DMCA notices to Google (*id.* ¶ 37), the only plausible interpretation of that imprecise attribution in light of the remaining portions of the SAC is that Iuculano did so in his capacity as an employee of Barrett.  Indeed, paragraph 37 marks one of several instances in which the Source Capital appears to have amended the FAC merely by sticking Iuculano's name next to Barrett's name in relation to allegations concerning what Barrett did.  (*See, e.g.*, Doc. 63-1 at 7, 9.)  Accordingly, the motion to dismiss Count One is granted as to Iuculano.  *See, e.g., Dickenson v. Haga*, 2019 WL 416720, *3 (C.D. Cal. 2019) ("Plaintiff merely sets forth allegations as to actions taken by 'Defendants' as a collective group.  Absent specific allegations identifying what actions each defendant took against Plaintiff and how such actions violated Plaintiff's rights, the Complaint fails to provide Defendants with fair notice of Plaintiff's claims or the grounds upon which they rest.  As such, Plaintiff's claims against each individual defendant are subject to dismissal.") (citations omitted).

IV.   Count Two—Tortious Interference With Prospective Economic Advantage

A.   **The Parties' Arguments**

Barrett contends that "Source Capital's economic relationships are speculative" because they "do not indicate any existing business relationships" and "merely represent

potential future customers" and because any "likelihood of economic benefit" is "too tenuous to convincingly argue anything beyond mere speculation of economic gain." (Doc. 67 at 9-11.)  Barrett further contends that "Source Capital does not identify a specific customer or explain how Barrett would have knowledge of the relationship."  (*Id.* at 11.) Next, Barrett contends that "evidence of an actual disruption does not exist and is not pled" because "the SAC relies on broad, conclusory statements, lacking a concrete factual foundation" rather than specific existing relationships and improper "information and belief" allegations.  (*Id.* at 12-13.)  Finally, Barrett contends that "the SAC does not allege actual economic harm."  (*Id.* at 14.)  Iuculano joins these arguments.  (Doc. 72 at 5.)

Source Capital responds that it "need not provide factual allegations at the level of detail argued by Barrett" and that "[c]ourts have found [similar] allegations . . . sufficient to state a claim." (Doc. 77 at 14-15.)  Source Capital contends it is not required "to identify a single specific customer, actual transaction, or quantifiable financial loss" because "[t]he facts pled state a claim which is plausible on its face that its relationships with the certain classes of individuals and consumers were intentionally interrupted by Barrett and Iuculano." (*Id.* at 15.)  Finally, Source Capital contends that the Court can infer from its allegations that "damages" were "already incurred," but "[s]hould the Court deem damages to be insufficiently pled, Source Capital would amend the complaint to state that the damages resulting from the interference have been suffered and will continue to accrue." (*Id.* at 16-17.)

In reply, Barrett reiterates that "Source Capital's classes of customers are speculative" and that "Source Capital does not identify a specific customer, explain how Barrett would have knowledge of the relationship, or allege an actual disruption."  (Doc. 80 at 9-10.)  Iuculano joins Barrett's reply and offers no additional arguments.  (Doc. 81.)

B.    **Analysis**

Count Two is a claim for tortious interference with prospective economic advantage.  Under California law, which the parties agree applies here, such a claim "has five elements: (1) the existence, between the plaintiff and some third party, of an economic

- 16 -

relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship;[5] (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 803 (Cal. 2017). To satisfy the fourth and fifth elements, Source Capital must allege facts plausibly supporting "an economic relationship between the plaintiff and some third party" and "the probability of future economic benefit to the plaintiff . . . that was disrupted as a result of the allegedly tortious action." *Soil Retention Prod., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021) (cleaned up).

Source Capital has failed to cure the defects in the FAC as to Count Two. To its credit, Source Capital has provided a bit more detail than before regarding the types of consumers with whom it claims to have economic relationships. (Doc. 63 ¶¶ 51-52 ["Source Capital has economic relationships with the following classes of consumers: past customers looking to obtain a new purchase or refinance loan through Source Capital; internet users that are actively shopping for a hard money mortgage lender and relying on the content of Barrett and Iuculano's websites to make that determination and comparison; customers that have submitted inquiries to Source Capital to obtain a hard money mortgage loan, etc."].) However, one of these new classes—"internet users"—does not implicate the required prior economic relationship. *Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994) ("Roth cannot have an existing relationship with . . . future referrals and patient contacts.").

Additionally, even if the other alleged classes are now sufficiently defined, Source Capital has failed to address the main critique in the earlier dismissal order—the SAC's allegations still do not support a plausible inference as to how Barrett's conduct, apart from the DMCA notices, interfered with Source Capital's existing economic relationships. The

---

5   As noted in the earlier dismissal order, "Source Capital has clarified that its tortious interference claim is not premised on the transmission of the DMCA notices but on unrelated forms of misconduct (*i.e.*, alleged false advertising and other efforts to confuse Source Capital's customers). (Doc. 56 at 12.) This clarification mooted Barrett's previous attempt to raise a preemption challenge to Count Two.

SAC merely alleges that "[o]n information and belief, Source Capital had failed negotiations with its customers and other customers did not use Source Capital for their lending needs and instead chose Barrett and Iuculano based on the false representations about the various associations in violation of 12 C.F.R. §1014.3(n)." (Doc. 63 ¶ 52.)  Such allegations are too vague and conclusory to support a plausible inference that Source Capital lost future business from its existing customer relationships because Barrett's website falsely described Barrett as "a member of AAPL and the Arizona Commercial Mortgage Lenders Association" and "an 'Accredited Business' with the Better Business Bureau." (Doc. 63 ¶ 49.)  *See, e.g.*, *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 982 (S.D. Cal. 2020) ("Speculative allegations concerning actual disruption and economic harm are insufficient to state a claim."); *Vascular Imaging Pros., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019) ("Plaintiff has merely concluded that Defendants acted in concert and that it lost sales but has failed to plead facts in support of these contentions."); *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal. 1997) ("Even if interference with potential customers is a legitimate basis for tortious interference with economic relations, the complaint alleges only conclusory statements and no facts in support of its contention that it lost potential customers.  For example, there is no allegation that sales of a particular software product identified with Silicon Knights decreased after these alleged statements were made by Crystal Dynamics.").

The SAC's allegations of harm underlying Count Two also fail for an additional reason.  Those allegations are pled "[o]n information and belief," but they do not allege facts uniquely within the knowledge of Barrett or Iuculano or rest on plausible inferences arising from other well-pleaded facts.  *See, e.g.*, *Rearden LLC v. TWDC Enterprises 18 Corp.*, 2024 WL 1250161, *3 (N.D. Cal. 2024) ("While a plaintiff is entitled to plead facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible, neither is true of Rearden's allegation here.")

(cleaned up).

Finally, Iuculano is entitled to the dismissal of Count Two not only for the same reasons as Barrett but also for the additional reason that, as discussed in Part III.B, the SAC does not allege facts that could make Iuculano individually liable for Barrett's conduct.

V.    <u>Count Three—UCL Claim</u>

A.    **The Parties' Arguments**

Barrett argues that "Source Capital has not alleged an actual injury." (Doc. 67 at 15.) Barrett further contends that "Source Capital has not sufficiently alleged a causal connection" between "text on Mr. Iuculano's website" and alleged "failed negotiations and lost business revenue." (*Id.* at 16.) Iuculano joins Barrett's arguments. (Doc. 72 at 5.)

Source Capital responds that "it has alleged that it suffered injury" from "Barrett's false advertising and attempts to create similar website names and website content as Source Capital in an attempt [to] confuse Source Capital's customers." (Doc. 77 at 17.)

In reply, Barrett reiterates that "Source Capital has not alleged an injury arising from an alleged violation of Cal. Bus. & Prof. Code §17200" because the SAC "does not identify a specific customer or allege an actual disruption." (Doc. 80 at 10-11.) Iuculano offers no additional arguments in reply. (Doc. 81.)

B.    **Analysis**

To have statutory standing to bring a claim under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 884-85 (Cal. 2011) (emphasis in original); Cal. Bus & Prof. Code § 17204. *See also ConsumerDirect, Inc. v. Pentius, LLC*, 2022 WL 16949657, *7 (C.D. Cal. 2022) ("Private enforcement actions under the UCL may only be brought by those who have suffered direct economic injury. This standing requirement is narrower than Article III standing; whereas a federal plaintiff's injury in fact may be intangible and need not involve lost money or property . . . a UCL plaintiff's

injury in fact must specifically involve lost money or property.") (cleaned up).  "There are innumerable ways in which economic injury from unfair competition may be shown.  A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."  *Kwikset*, 246 P.3d at 885-86.

Source Capital attempts to satisfy this statutory requirement by alleging that "[o]n information and belief, Source Capital had failed negotiations with its customers and other customers did not use Source Capital for their lending needs and instead chose Barrett and Iuculano based on the false representations about the various associations in violation of 12 C.F.R. §1014.3(n)."  (Doc. 63 ¶ 58.)  As with Count Two, this allegation—in addition to being impermissibly based "on information and belief"— is too vague and conclusory to plausibly establish harm and causation.  *See, e.g.*, *Seitzinger v. Select Portfolio Servicing, Inc.*, 2018 WL 2010993, *4 (N.D. Cal. 2018) ("While Seitzinger alleges that she suffered damages in the amount of foreclosure fees and costs added to her loan in an amount to be proven at trial, such statements are conclusory and are not entitled to be assumed true.  Nor has Seitzinger sufficiently pled injury caused by SPS' conduct.") (cleaned up); *Zamfir v. CasperLabs, LLC*, 2022 WL 14915618, *16 (S.D. Cal. 2022) ("[T]he Second Amended Complaint lacks any non-conclusory allegation that the value of the Casper's service has decreased. . . .  [S]ome detail as to the general value of the alleged injury is still necessary to allege damages under a UCL claim."); *Panno v. Wells Fargo Bank, N.A.*, 2016 WL 7495834, *10 (C.D. Cal. 2016) (although "loss in equity constitutes economic injury" under the UCL, the allegation that "as a direct result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff has lost equity in the Property" is insufficient because Plaintiff "has not explained with sufficient specificity exactly how defendant caused his damage") (cleaned up).

Finally, Iuculano is entitled to the dismissal of Count Three not only for the same

1   reasons as Barrett but also for the additional reason that, as discussed in Part III.B, the SAC

2   does not allege facts that could make Iuculano individually liable for Barrett's conduct.

3   VI.   Count Four—Declaratory Judgment

4        A.   **The Parties' Arguments**

5        Barrett argues that Source Capital's request for declaratory relief "may be

6   dismissed" because "Barrett does not claim knowledge one way or the other regarding

7   copyright claims of any of the parties regarding Plaintiff's banner" and "aside from the

8   DMCA notices it does not appear that any of the parties here claim a copyright in the banner

9   ad at issue." (Doc. 67 at 17.)

10       Source Capital responds that (1) "Barrett does not seek dismissal of this claim in the

11  notice of motion"; (2) "it would be premature to dismiss this claim because Barrett has not

12  yet filed an answer, and thus, its position taken in a motion cannot override the facts pled

13  in the SAC"; and (3) "the proper adjudication would be the requested declaratory judgment

14  in Source Capital's favor, not dismissal." (Doc. 77 at 18.)

15       In reply, Barrett argues Count Four should be dismissed because "[n]one of the

16  parties claim a copyright and Barrett should not be required to participate in expensive

17  litigation including extensive discovery when there is no underlying cause of action against

18  it," and "[p]resumably, the sole basis for Source Capital's request to maintain it is to seek

19  attorney's fees and costs under 17 U.S.C. § 505 or to make good on its threats [to] make

20  Barrett pay if it didn't settle." (Doc. 80 at 11.)

21       B.   **Analysis**

22       In Count Four, Source Capital seeks a declaration "that its banner ad does not

23  infringe on any alleged copyright of Defendant Barrett, or any other exclusive rights that

24  Defendant might assert under state or federal law." (Doc. 63 ¶ 65.) Meanwhile, Barrett's

25  position is that it does not "claim a copyright." (Doc. 80 at 11.) The Court is not aware of

26  Barrett asserting any other exclusive rights under state or federal law regarding the banner.

27  (*See also* Doc. 67 at 3 ["Barrett has never claimed to be the copyright owner. . . . Barrett

28  clearly asserts that it holds no ownership or control over the websites referenced in the

DMCA notices. . . .  Barrett has denied any claim of copyright ownership for the images or content on the 'hardmoneylenders.com' website."].)

Because of the lack of disagreement between the parties, there is no justiciable controversy.  This conclusion is consistent with the position Source Capital previously took when successfully seeking dismissal of Barrett's anticipatory lawsuit, which also sought a declaratory judgment.  Doc. 33, *Barrett Fin. Grp., LLC v. Source Capital Funding, Inc.*, 2:23-cv-00387, at 9 (D. Ariz. 2023) ("Source Capital is not asserting a claim for actual copyright infringement and Barrett expressly disavows any ownership of copyrights that were the alleged subjects of the DMCA notices. . . .  Likewise, Barrett in its complaint does not assert that it owns any copyrights as to the same material.  It claims that DMCA notices were issued without its knowledge or consent by others who acted without Barrett's permission or authority.  Accordingly, both parties agree that the DMCA notices were false, and neither party is asserting any claims for copyright infringement against the other.")  Although perhaps there could be a justiciable controversy between Source Capital and other parties such as Search Control (Doc. 71 ¶ 29), Source Capital seeks a declaratory judgment only against Barrett in Count Four.  (Doc. 63 at 18.)  The Court therefore concludes that Count Four does not present a justiciable controversy and must be dismissed.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) ("As required by Article III, courts may adjudicate only actual cases or controversies.  When presented with a claim for a declaratory judgment, therefore, federal courts must take care to ensure the presence of an actual case or controversy, such that the judgment does not become an unconstitutional advisory opinion.") (citation omitted); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (internal quotation marks omitted).  This conclusion makes it unnecessary to resolve whether Barrett should have moved for dismissal of Count Four in its notice of motion.  *Gonzalez v. Thaler*,

565 U.S. 134, 141 (2012) ("Subject-matter jurisdiction can never be waived or forfeited.").[6]

VII.   Leave To Amend

Source Capital seeks leave to amend in the event of dismissal.  (Doc. 77 at 18-19.)  Barrett and Iuculano oppose amendment.  (Doc. 67 at 17; Doc. 72 at 1.)   The Court concludes that leave to amend should be denied because Source Capital was previously granted leave to amend yet was unable to cure many of the deficiencies identified in the earlier dismissal order.  (Doc. 56.)  This suggests that another round of amendments would be futile.  Additionally, this case has now been pending for over a year.  "Where the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020) (cleaned up).

Accordingly,

**IT IS ORDERED** that Barrett's motion to dismiss (Doc. 67), joined by Iuculano (Doc. 72), is **granted in part and denied in part**.  Count One is dismissed without leave to amend as to Iuculano.  Counts Two, Three, and Four are dismissed without leave to amend in their entirety.  Count One remains pending against Barrett and Search Control.

Dated this 29th day of April, 2024.

Dominic W. Lanza
United States District Judge

---

[6]    Alternatively, even if the absence of an actual controversy didn't pose a subject-matter jurisdiction problem, this consideration would cause the Court to simply decline in its discretion to entertain the request for declaratory relief.  *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) ("[Even if] the suit [for declaratory relief] passes constitutional and statutory muster, the district court must also be satisfied that entertaining the action is appropriate.  This determination is discretionary, for the Declaratory Judgment Act is deliberately cast in terms of permissive, rather than mandatory, authority.  The Act gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.") (cleaned up); *id.* at 1225 n.5 (noting that one of the relevant "considerations" bearing on whether to entertain a request for declaratory relief is "whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue").